BJR Corporation, Petitioner *v.*
Commissioner of Internal Revenue, Respondent

Docket No. 3358–75.   Filed November 2, 1976.

*David Irvin Couvillion* and *Theodore L. Jones,* for the petitioner.
*Deborah R. Jaffe,* for the respondent.

Raum, *Judge:* Petitioner is the successor in interest to the taxpayer, Jefferson Sales & Distributors, Inc. (Jefferson), which was merged into it on June 1, 1970. The Commissioner determined an income tax deficiency in the amount of $144,536.66, and an addition to tax under section 6651(a),

I.R.C. 1954, in the amount of $36,134.16, in respect of Jefferson's short tax year which began on September 2, 1969, and ended, as a result of the merger, on May 31, 1970. The parties have stipulated that petitioner "is liable as the successor in interest to Jefferson for any deficiency in income tax and any penalty which may be determined by the Court herein." We must decide the following questions:

(1) Whether the issuance of the statutory notice of deficiency was barred by the 3-year period of limitations set forth in section 6501(a). If it was not so barred, then four additional matters must be resolved:

(2) Whether the entire $795,675 which Jefferson received during the taxable year from the Federal Government pursuant to certain agreements was includable in its gross income that year;

(3) Whether deductions claimed for travel and entertainment expenses are properly allowable;

(4) Whether Jefferson was a "component member" of a "controlled group" of three corporations and therefore entitled to only one-third of a $25,000 surtax exemption; and

(5) Whether petitioner is liable for the section 6651(a) additions to tax.

### FINDINGS OF FACT

The parties have filed a stipulation and two supplemental stipulations of fact which, together with their accompanying exhibits,[1] are incorporated herein by this reference.

BJR Corp. (BJR), the petitioner, was organized under the laws of Louisiana on June 30, 1965, and had its principal place of business in Gretna, La., at the time the petition was filed herein. At all relevant times J. Marshall Brown was president of BJR. As of December 31, 1969, he owned all of its outstanding stock.

On August 17, 1969, Hurricane Camille struck the coast of the United States along the Gulf of Mexico causing considerable damage in Louisiana and Mississippi. Soon thereafter the President of the United States declared this occurrence a major disaster for each of those States and made available Federal assistance. As part of this overall relief effort, the

---

[1] The respondent has noted objections to the admissibility in evidence of certain of those exhibits, which objections we now overrule.

Federal Government acting through the Department of Housing and Urban Development (HUD), proceeded to lease mobile homes and, in turn, to make them available by sublease, or otherwise, to the victims of the hurricane as temporary housing.

Jefferson Sales & Distributors, Inc. (Jefferson), was organized by J. Marshall Brown and three other persons on September 2, 1969, to acquire mobile homes and rent them to HUD. At all relevant times, Brown was the president of Jefferson and played the dominant role in its affairs. While at the time Jefferson was organized, on September 2, 1969, Brown owned less than 80 percent of the outstanding stock, as of December 31, 1969, he held shares possessing 80 percent of the total value of shares of all classes of its stock. The record does not disclose with specificity when he acquired the additional shares to make up the total of 80 percent which he held at the end of 1969.

Jefferson entered into two agreements with HUD (the HUD contracts) dated, respectively, September 12, 1969, and November 13, 1969, for the "Lease of mobile home units for Hurricane Camille disaster area(s) * * * including delivery; installation; and removal." The agreements, with subsequent modifications, provided that Jefferson would lease to the Federal Government a total of 301 mobile homes for terms of either 9 months or 1 year. The 9-month terms could be extended up to 4 months, on a month-to-month basis, at a specified additional cost per month. In each instance the term of the lease was to run from the date the particular mobile home was delivered and installed at the site, and inspected and accepted by HUD. The total rental for the term of the lease was payable also at that time, under one of the contracts, and approximately 30 days thereafter, under the other. Each contract also specified that the Federal Government had the option to terminate the lease in respect of any mobile home for its own convenience, in which event the rental due under the contract was to be "equitably reduced."[2]

Under the two contracts Jefferson was required to install the mobile homes at sites designated by HUD. Installation

---

[2] A failure to agree on an equitable reduction was to be resolved in accordance with a provision pertaining to factual disputes arising under the contract.

included placing the mobile homes on blocks, anchoring and "strapping" them, and connecting them to existing utilities. The mobile homes were to meet certain specifications as to both size and type of construction and were to be provided with various fixtures, equipment, and furnishings, including a heater, water heater, cooking range, kitchen exhaust fan, fuel tanks, fire extinguisher, steps, window and door screens, drapes, and adequate furniture. Furthermore, each unit had to be equipped with an expendable living package, which need not be returned to the lessor, consisting of bed linen, towels, cooking utensils, and tableware. Upon termination of the leases, it was the obligation of Jefferson to remove the mobile homes from wherever they were located.

At the time it entered into these contracts Jefferson did not own any mobile homes. Instead, it proceeded to purchase these homes from various manufacturers. The total amount of rent in respect of these short-term leases to be paid by HUD for each mobile home under the contracts ranged from $2,250 to $3,125, and in each instance, was almost the same as the cost to Jefferson of purchasing the particular unit. To enable it to pay the manufacturers for the mobile homes on or before their delivery, Jefferson obtained short-term financing through a commercial bank.

Included in the HUD contracts were warranties by Jefferson in respect of the condition of the homes and the performance of the equipment included therein. Prior to acceptance of the homes by HUD a number of corrections were called for as a result of shoddy performance by the manufacturer. After the installation and acceptance (by HUD) of the mobile homes, Jefferson had a man on call to correct any complaints about them which it might be required to remedy. He was paid for time and materials, and it does not appear that his services were of a character other than those customarily performed by a lessor. On a few occasions Jefferson was called upon to reset or restrap mobile homes that had moved or turned over in a windstorm.

On October 14, 1969, 1-year leases became effective in respect of 151 mobile homes. Nine-month leases for 25 homes went into effect on November 13, 1969, and 9-month leases for the last 125 of the 301 mobile homes became effective on December 10, 1969. The total amount due under the contracts

upon the acceptance by HUD of the 301 homes was $795,675. This amount was paid to Jefferson as follows:

| Date of payment | Amount of payment | Date of payment | Amount of payment |
|---|---|---|---|
| 10/22/69 | $135,000 | 12/22/69 | $265,380 |
| 10/30/69 | 135,000 | [3]2/24/70 | 107,295 |
| 11/20/69 | 108,000 | | 795,675 |
| 11/24/69 | 45,000 | | |

The HUD contracts placed no restrictions on the use to which Jefferson could put the payments it received.

On June 1, 1970, Jefferson was merged into BJR and the latter assumed all of its liabilities. As a result of this merger, Jefferson's only tax year, which had begun on September 2, 1969, terminated on May 31, 1970.[4] While in existence, Jefferson employed an accrual method of accounting.

Jefferson maintained a disbursement journal in which the following 23 items were listed:

| Date | Payee | Amount |
|---|---|---|
| 12/31/69 | J. Marshall Brown & Pittman | $733.10 |
| 1/5/70 | Sugar Bowl Tickets | 56.00 |
| 1/12/70 | Hotel Washington | 759.93 |
| 1/16/70 | J. Marshall Brown | 200.00 |
| 1/21/70 | J. Marshall Brown | 401.72 |
| 1/24/70 | J. Marshall Brown | 250.00 |
| 3/6/70 | Bank Americard | 500.00 |
| 3/6/70 | J. Marshall Brown | 1,000.00 |
| 3/6/70 | Hertz Car Rental | 357.40 |
| 3/18/70 | Hotel Washington | 309.16 |
| 3/18/70 | Diner's Fugazy Travel | 448.60 |
| 3/23/70 | Diner's Fugazy Travel | 100.00 |
| 3/25/70 | American Express | 2,692.43 |
| 4/20/70 | J. Marshall Brown | 500.00 |
| 4/20/70 | Marshall Brown Insurance | 907.20 |
| 4/21/70 | T. Jones | 293.68 |
| 5/14/70 | H. Netterville | 90.00 |
| 6/12/70 | Eastern Airlines | 165.90 |
| 6/18/70 | American Express | 944.68 |

---

[3] Jefferson had a dispute with one of the mobile home manufacturers about the condition of the homes it had produced. Jefferson withheld payment for the homes and was thereupon sued by the manufacturer. To protect itself from possible liability, HUD withheld the final payment under its contracts with Jefferson until the latter agreed to enter into a bonded indemnity agreement. The suit was subsequently settled.

[4] See sec. 381(b), I.R.C. 1954.

| | | |
|---|---|---|
| 6/18/70 | Roosevelt Hotel | 445.20 |
| 6/30/70 | Pan Air Corp. | 339.00 |
| 6/30/70 | J. Marshall Brown | 300.00 |
| 7/14/70 | J. Marshall Brown | 358.00 |
| | | [1]11,652.00 |

[1] See n. 5, *infra*, p.118.

All of these items, with two exceptions—the item designated "J. Marshall Brown & Pittman" and the item designated "Pan Air Corporation"—were entered in the journal as travel and/or entertainment expense.

During the short tax year that Jefferson was in existence, J. Marshall Brown engaged in numerous other activities besides those concerned with Jefferson's business. For example, he served as a Democratic National Committeeman. His other business interests included insurance, construction, and real estate. The insurance business was apparently conducted through Marshall Brown Insurance Agency, Inc., in which Brown owned all of the stock as of December 31, 1969. At that time he also owned 75 percent of the outstanding stock of Gulf States Public Relations Co., Inc.

In connection with all of these various activities, Brown incurred travel and entertainment expenses. In particular, he went to Washington, D. C., on several occasions. On any one of these trips he might have conducted business for one or more of his many enterprises. The expenses incurred on these trips would be charged on his own personal credit card accounts or an American Express account in the name of "J Marshall Brown/Marshall Brown Insur," or in some cases paid by check or in cash. Brown did not keep any records, contemporaneous or otherwise, which indicated the amount of time he devoted on these trips to each of his many activities.

The item in the journal designated "T. Jones" represented an amount paid to an attorney in Washington, D. C., for legal services rendered during the tax year ended May 31, 1970, which services related to the HUD agreements.

Occasionally it would become necessary for an employee of Jefferson to rent a car or truck in connection with the corporation's business. On November 5, 1969, a 14-foot stake truck was rented from Hertz Truck Rental for 3 days, at a total cost of $155.80, to visit the mobile home installation sites in Louisiana and Mississippi.

No timely income tax return was filed on behalf of Jefferson for the tax year ended May 31, 1970. During April or May of 1972, while Brown was meeting with internal revenue agents about a jeopardy assessment against him in respect of his personal income taxes, he was informed that the Internal Revenue Service had not received an income tax return from Jefferson. Brown conferred with his accountant, David L. Goldstein of J. K. Lasser & Co., and on June 19, 1972, a return prepared by the accountant and signed by J. Marshall Brown was filed on behalf of Jefferson for the year ended May 31, 1970. The tax due, as shown thereon, was paid at that time. Attached to this return was a statement signed and sworn to by Brown before a notary public as follows:

It is our understanding that the Internal Revenue Service has not been able to find the attached federal income tax return of Jefferson Sales and Distributors, Inc. for the fiscal period September 2, 1969 to May 31, 1970.

To the best of our knowledge and belief this return was filed as the final return of this corporation. This corporation was merged pursuant to Reg. Sec. 1.368-3(a) with BJR Corporation on May 31, 1970.

During this merger we changed accounting firms from Duplantier, Hrapman and Hogan, Certified Public Accountants to J. K. Lasser & Company, Certified Public Accountants. Due to the change in accounting firms and due to the complications of the merger, the return was not filed by August 15, 1970.

We were informed that the previous accounting firm was of the opinion that this corporation would end its fiscal year on August 31, 1970, being 12 months after the date of incorporation. They were not aware of the short year due to the merger on May 31, 1970, and accordingly did not request an extension of time in which to file.

To the best of our knowledge and belief the return was filed in December of 1970.

The Internal Revenue Service has no record of receiving a Federal income tax return for Jefferson prior to June 19, 1972.

On the return filed on June 19, 1972, income of $536,700 was reported as "Rents." The remaining $258,975 received under the HUD contracts was shown as "Deferred Income" under the heading "Other Liabilities" on a balance sheet attached to the return, but was not included in gross income. The $258,975 was reported as gross income by BJR for tax years ending after May 31, 1970. Thus, on its return for its tax year ended June 30, 1970, BJR reported $77,083 as "Rents," and on its return for the tax year ended June 30, 1971, it

included the balance, $181,892, in gross income. These returns were filed on June 19, 1972, the same day that Jefferson's aforementioned return was filed.

On the return filed on June 19, 1972, on behalf of Jefferson a deduction was claimed for "Travel & Entertain." in the amount of $13,237. This amount included the 23 items in its disbursement journal stipulated to total $11,652 (see n. 5 below). A surtax exemption in the amount of $25,000 was also claimed.

In the deficiency notice to BJR as successor in interest to Jefferson, the Commissioner determined that: (1) For the taxable year Jefferson's "rental income is $795,675.00 instead of $536,700.00 reported on [its] return * * * [since] advance rentals must be included in income for the year of receipt regardless of the period covered or the method of accounting employed"; (2) the "deduction of $13,237.00 claimed for travel and entertainment expense is not allowed to the extent of $11,651.52[5] because it has not been established that any amount in excess of $1,585.48 constitutes an ordinary and necessary business expense or was substantiated as required by section 274 of the Internal Revenue Code"; and (3) the "allowable surtax exemption is $6,250.00," one-fourth of the surtax exemption of $25,000 which must be "apportioned equally among [Jefferson], Marshall Brown Insurance Agency, Inc., B.J.R. Corporation, and Gulf States Public Relations, Inc." The Commissioner also determined that petitioner was liable for a 25-percent addition to tax under section 6651(a) because the Jefferson return "was not filed within the time prescribed by law" and petitioner had "not shown that the failure to file your return on time was due to reasonable cause."

---

[5] In his answer to petitioner's interrogatory 1, the Commissioner presented an itemized list of the 23 items which had been disallowed; the list was apparently derived from Jefferson's disbursement journal (see p.115, *supra*). The parties have stipulated that these 23 items comprise "the travel and entertainment expenses disallowed by respondent in the amount of $11,652.00." However, simple addition reveals that the actual sum of these 23 amounts is neither $11,652 (as stipulated) nor $11,651.52 (as asserted in the deficiency notice), but is instead $12,152. The discrepancy between these three figures is nowhere explained in the record.

OPINION

1. *Statute of limitations.*—The first issue in this case is whether the statutory notice of deficiency herein was barred by the 3-year period of limitations set forth in section 6501(a).[6] Its resolution depends solely upon a factual question. If, as petitioner contends, an income tax return was filed on behalf of Jefferson sometime in December 1970, then the statutory notice issued on January 17, 1975, was not timely. If, however, no return was filed until June 19, 1972, as respondent contends, then the notice of deficiency was mailed well within the 3-year period prescribed by section 6501(a).[7]

In support of its position petitioner offered the testimony of four witnesses: J. Marshall Brown, David L. Goldstein, who was the accountant for Brown and his corporations, Lillian Tipton, who had been Brown's secretary, and William E. Wonders, who had been an employee of Jefferson. However, their testimony was wholly inadequate to establish that a return had been prepared and mailed (without payment of tax) in December 1970, and indeed there are strong affirmative indications in the record that no such return was filed at that time.

---

[6] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(a) GENERAL RULE.—Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

[7] Although the parties have stipulated that petitioner BJR "is liable as the successor in interest to Jefferson for any deficiency in income tax and any penalty which may be determined by the Court herein," it is arguable that petitioner is, in addition, a transferee of the taxpayer. Sec. 301.6901–1(b), Proced. & Admin. Regs.; 9 Mertens, Law of Federal Income Taxation, sec. 53.16, pp. 29–31 (1971 rev.); see *Turnbull, Inc.,* 42 T.C. 582, 583–587, affirmed 373 F.2d 91 (5th Cir.), certiorari denied 389 U.S. 842; *Popular Library, Inc.,* 39 T.C. 1092, 1099–1100; *Texsun Supply Corp.,* 17 T.C. 433, 440–442; *Shamrock Oil Co.,* 29 B.T.A. 910, 914–915, affirmed 77 F.2d 553 (5th Cir.); cf. *A.D. Saenger,* 38 B.T.A. 1295, 1302–1303; *Oswego Falls Corp.,* 26 B.T.A. 60, affirmed 71 F.2d 673 (2d Cir.). And, in cases where transferee liability is involved, sec. 6901(c)(1) extends, for an additional year, the normal 3-year period of limitations provided by sec. 6501(a). However, neither party has treated sec. 6901(c)(1) as applicable herein; and, in any event, the matter is not one of consequence in this case, because the Jan. 17, 1975, notice of deficiency would be untimely even under a 4-year rule if a return had been filed in December 1970, while it would be timely even under the 3-year rule, if no return was filed until June 19, 1972.

Wonders testified that he was with Brown (presumably in the spring of 1972) when the "Internal Revenue people" brought up the subject of the failure to file a return for Jefferson, that Brown, upon learning that the Internal Revenue Service had no record of a return having been filed by Jefferson, "hit the roof" and "bawl[ed] us out for not having it filed," and that he (Wonders) responded by saying that "the CPA was supposed to have filed it."

Goldstein testified that a return had been prepared in November or December of 1970, and that the return filed in June 1972, was prepared from his retained copy of the earlier return. We have considerable doubt as to whether any return was in fact prepared before 1972. No copy of such a return was shown to the internal Revenue Service when it was learned that the Service had no record of receiving any return on behalf of Jefferson. Nor, for that matter, was the accountant's supposedly retained copy of this purported return offered into evidence here. And, although Brown and Wonders testified that the files of Jefferson should have contained a copy of the return allegedly prepared in 1970, they further testified that no such copy could be found.

Even assuming that a return was prepared sometime in 1970, we cannot conclude that it was filed. In this regard, we recognize that it might be sufficient for petitioner to show by satisfying evidence that the return was properly mailed. But the evidence plainly fails to do so. Brown could not recall having signed the return, and not one of the witnesses testified that this particular return was in fact mailed. Moreover, the testimony concerning the procedure that would have been followed in filing the return was contradictory and inconclusive. Brown stated that he never mailed returns, but that instead Goldstein, his accountant, would prepare them, obtain Brown's signature, and then mail the returns. According to Goldstein, however, it was generally the client's responsibility to mail the return. Although on occasion he might have mailed a return at Brown's request, he did not recall mailing the return purportedly filed in December 1970, and Brown did not recall asking Goldstein to do so. To be sure, both Brown and Tipton, his former secretary, testified that it was the habit of Brown and his corporations to file their returns on time, even if they could not pay the tax due at the

time of filing. But whatever significance that fact might have, the testimony in support of it was plainly contradicted by the fact that the Jefferson return would not have been timely even if filed in December, and more importantly, by the fact that BJR's returns for the years ended June 30, 1970 and 1971, were not filed until June 19, 1972, the same day on which a return was finally received by the IRS on behalf of Jefferson.

In contrast, the Government offered evidence as to the elaborate procedures followed to ensure not only that returns it received were not lost, but also that a record of their having been received was maintained. Its witness testified to the extensive search of those records conducted to determine whether a return for Jefferson had been received prior to June 1972. The search did not disclose that such a return had been filed. In the circumstances, we conclude that petitioner has failed to prove that the income tax return for the year ended May 31, 1970, was filed on behalf of Jefferson before June 19, 1972, and accordingly, the notice of deficiency issued herein was not barred by the statute of limitations. We therefore turn to those adjustments made by the Commissioner which are contested.

2. *HUD payments.*—During the taxable period ended May 31, 1970, Jefferson in fact received $795,675 from the Federal Government as lease payments under the HUD contracts. On its tax return for that period, however, there was included in gross income only $536,700 in respect of those payments. The remaining $258,975 was included in BJR's gross income for subsequent years in returns that were filed on June 19, 1972,[8] simultaneously with the filing of Jefferson's return. It is petitioner's position that since the duration of the HUD contracts extended beyond May 31, 1970, and since Jefferson accounted for its income on an accrual basis, it was entitled to defer, for tax purposes, the inclusion in its income of that portion of the HUD payments ($258,975) not reported on its return. Respondent contends that the entire $795,675 was includable in Jefferson's gross income for the taxable period ended May 31, 1970. We agree with respondent.

---

[8] These returns are in evidence, and notwithstanding the inclusion of the remaining HUD payments in BJR's income, the total taxable income disclosed on each such return was zero.

It cannot be seriously questioned that during the tax year petitioner realized income in the full amount of the HUD payments it received. Although one of the several positions taken by petitioner is that the payments were not rents but advances of capital, we find this suggestion wholly without merit. Throughout the negotiations the parties referred to the proposed transactions as the leasing or renting of mobile homes. Indeed, the contracts themselves state that they pertain to the "Lease of Mobile Home Units." Furthermore, the substance of the transactions bears little, if any, resemblance to a loan. Although if any of the leases for particular homes had been terminated prematurely a portion of the total lease payments might have to have been refunded, there was no firm promise to repay the $795,675 petitioner was to receive from HUD. Cf. *United States v. Williams*, 395 F.2d 508 (5th Cir.). In the absence of such a promise, it is not surprising that the other customary—although not indispensable— features of a loan, such as an interest rate and repayment date, were likewise missing. Cf. *Kohler-Campbell Corp. v. United States*, 298 F.2d 911, 913 (4th Cir.). The mere fact that the payments from HUD were used by Jefferson for capital expenditures related to the performance of its obligations under the HUD contracts did not convert the HUD payments from rents into nontaxable advances of capital. *Palm Beach Aero Corp.*, 17 T.C. 1169, 1177–1178.

We must also reject petitioner's contention that because it was received subject to a "contingency," a portion of the $795,675 was not income realized during the tax year in issue. To be sure, as petitioner contends, there might be circumstances in which the amounts received by a taxpayer are subject to such restrictions that they are not includable in its gross income. But no such circumstances were present here. Unlike the taxpayer in *Commissioner v. Riss*, 374 F.2d 161, 171–172 (8th Cir.), affirming in part and reversing in part a Memorandum Opinion of this Court, upon which petitioner relies, Jefferson was not required to set aside the HUD payments for any specific purpose. Nor, like the taxpayers in the other cases petitioner cites, did Jefferson receive payments to which it was not entitled but which it was instead required by law to pay over to someone else. Cf. *Commissioner v. Turney*, 82 F.2d 661 (5th Cir.), affirming 31 B.T.A. 308;

*Commissioner v. Brown,* 54 F.2d 563, 567 (1st Cir.), certiorari denied 286 U.S. 556, affirming in part and reversing in part 18 B.T.A. 859. The only "contingency" here was the possibility, previously noted, that HUD might elect to terminate the agreements and therefore become entitled to a refund of part of the payments it had made to Jefferson. However, inasmuch as Jefferson was free to do as it pleased with all of the moneys it had received from HUD, this possibility alone did not prevent it from realizing income in the year of receipt to the full extent of those payments. *South Dade Farms v. Commissioner,* 138 F.2d 818, 819 (5th Cir.), affirming a Memorandum Opinion of this Court; *New Capital Hotel, Inc.,* 28 T.C. 706, affirmed 261 F.2d 437 (6th Cir.); cf. *Brown v. Helvering,* 291 U.S. 193, 199; *Van Wagoner v. United States,* 368 F.2d 95 (5th Cir.).

Nevertheless, petitioner further contends that Jefferson, as an accrual basis taxpayer, should in any event have been entitled to defer until later tax years the inclusion in gross income of that part of the HUD payments it received which was attributable to the portion of the lease terms that extended beyond the taxable year. It is firmly established, however, that advance rentals are includable in income for the year of receipt irrespective of the method of tax accounting employed by the taxpayer. Sec. 1.61–8(b), Income Tax Regs.; *Hyde Park Realty v. Commissioner,* 211 F.2d 462 (2d Cir.), affirming 20 T.C. 43; *South Dade Farms v. Commissioner,* 138 F.2d at 819; *New Capital Hotel, Inc.,* 28 T.C. at 708; *Palm Beach Aero Corp.,* 17 T.C. at 1177–1178. The fact that for purposes of financial accounting the rentals might be considered attributable to a subsequent year is not of controlling significance.[9] *New Capital Hotel, Inc., supra* at 708–709; cf. *American Automobile Assn. v. United States,* 367 U.S. 687, 692–693.

---

[9] Despite petitioner's assertion to the contrary, the rule that prepaid rent must be included in income in the year of receipt does not violate the "annual accounting concept." Cf. *Burnet v. Sanford & Brooks Co.,* 282 U.S. 359. That concept does not require a "matching" of income and expense for tax purposes. Rather, it merely provides that items of income and deductible expense be reported in the year *otherwise* required by the tax laws even though, as a result, the taxpayer is "required to pay a tax on income in one period exceeded by net losses in another." 282 U.S. at 366.

It is petitioner's further position that this case falls within Rev. Proc. 71–21, 1971–2 C.B. 549, which was promulgated "to allow accrual method taxpayers in certain specified and limited circumstances to defer the inclusion in gross income for Federal income tax purposes of payments received (or amounts due and payable) in one taxable year for services to be performed by the end of the next succeeding taxable year." Rev. Proc. 71–21, *supra,* 1971–2 C.B. at 549.[10] Although this procedure plainly provides an exception to the general rule that income cannot be deferred beyond the year of receipt, cf. *E. Morris Cox,* 43 T.C. 448, 455–456, its scope is quite narrow. It specifically "has no application * * * to prepaid rent." Rev. Proc. 71–21, *supra,* 1971–2 C.B. at 550. In an effort to avoid this limitation, however, petitioner argues that the HUD payments are analogous to amounts received for the use of hotel rooms or the like, which for purposes of Rev. Proc. 71–21 are not considered rent. To be sure, both Rev. Proc. 71–21 and section 1.1372–4(b)(5)(vi), Income Tax Regs., referred to therein, define rent to exclude "payments for the use or occupancy of rooms or other space where significant services are rendered to the occupant." But the services referred to there are those like "maid service" and not "those usually or customarily rendered in connection with the rental of rooms or other space for occupancy only." Sec. 1.1372–4(b)(5)(vi), Income Tax Regs. Moreover, the use of hotel rooms and similar facilities with their attendant services is specifically distinguished from "the use or occupancy of entire private residences or living quarters in duplex or multiple housing units." According to section 1.1372–4(b)(5)(vi), Income Tax Regs., payments for the use of the latter types of properties are generally rent. Here most of the services performed by Jefferson were incidental to preparing the mobile homes for rental. After the leases began to run (upon acceptance of the installed units by HUD) Jefferson was obligated to perform little in the way of services, and those services which it was required to provide, stemmed principally from the warranties relating to the kind and functioning of equipment furnished

---

[10] This revenue procedure was issued "to implement an administrative decision, made by the Commissioner in the exercise of his discretion under section 446." Rev. Proc. 71–21, *supra,* 1971–2 C.B. at 549.

with the homes and the requirement that the homes be securely installed. In this respect the services were much like those a typical landlord would provide. Cf. *City Markets, Inc. v. Commissioner*, 433 F.2d 1240 (6th Cir.), affirming a Memorandum Opinion of this Court. In the circumstances, the HUD payments must be considered rents, and Rev. Proc. 71–21 is inapplicable.[11]

Finally, petitioner also relies on the statutory exception to the restrictions on deferring income beyond the year of receipt set forth in section 83 of the Code.[12] That provision was enacted to govern the tax treatment of "deferred compensation arrangements known as restricted stock plans." S. Rept. No. 91–552, p. 119, 1969–3 C.B. 500. Putting aside the question whether money such as the HUD payments can ever be considered "property" for purposes of section 83 (see sec. 1.83–3(e), Proposed Regs., 36 Fed. Reg. 10791 (June 3, 1971)), it seems that this provision is inapplicable here inasmuch as Jefferson received the payments not for services but for the

---

[11] We therefore express no opinion as to whether the various other conditions of Rev. Proc. 71–21 were satisfied.

[12] SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORMANCE OF SERVICES.

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

* * *

(c) SPECIAL RULES.—For purposes of this section—

(1) SUBSTANTIAL RISK OF FORFEITURE.—The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual.

(2) TRANSFERABILITY OF PROPERTY.—The rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture.

rental of mobile homes. Sec. 83(a). Furthermore, section 83 would in any event not permit the taxpayer to defer the inclusion of the payments in gross income to a year beyond that of receipt. It does not appear that the payments were not transferable during that year within the meaning of section 83(c). And prior to the close of the year Jefferson "dispose[d] of such property in an arm's length transaction" when it used the funds in connection with the acquisition of the mobile homes. See sec. 83(a). Accordingly, we hold that the entire amount of the payments received by Jefferson from the Federal Government in respect of the HUD contracts must be included in its gross income for the taxable period ended May 31, 1970.

3. *Travel and entertainment expenses.*—The Commissioner disallowed $11,651.52 (see n. 5, *supra,* p.118) of a $13,237 deduction claimed for travel and entertainment expenses. The amount disallowed pertained to 23 items which, in the Commissioner's view, were not adequately substantiated. To be eligible for a deduction in respect of such expenses, petitioner must not only demonstrate that the expenses were ordinary and necessary business expenses of Jefferson within the meaning of section 162, but it must also satisfy the additional substantiation requirements imposed by section 274(d).

We note at the outset that testimony adduced at trial revealed that 1 of the 23 items—$293.68 paid to T. Jones on 4/21/70—was not for travel or entertainment, but rather was for attorneys' fees incurred in connection with the HUD contracts. Thus the substantiation requirements of section 274 are inapplicable to this expenditure. And while the testimony in respect of this item was vague in some respects, we nevertheless found it credible. Therefore we hold that the $293.68 is deductible as a business expense.

Insofar as the remaining 22 items are concerned, petitioner has the burden under section 274(d) of substantiating "by adequate records or by sufficient evidence corroborating his own statement" (1) the amount of the expense, (2) the time and place of the travel or entertainment, (3) the business purpose of the expense, and, in the case of entertainment, (4) the business relationship to the taxpayer of the persons entertained. As the regulations explain "adequate records"

consist of account books, diaries, or similar statements "made at or near the time of the expenditures," and documentary evidence (such as bills or receipts) which together establish each of the prescribed elements. Sec. 1.274–5(c)(2), Income Tax Regs. In the absence of such records, "the taxpayer may alternatively satisfy the substantiation requirements by coming forward with 'corroborative evidence sufficient' to support his own statement containing specific information in detail as to each element of the expenditure, or such elements as have not been substantiated by adequate records." *William F. Sanford,* 50 T.C. 823, 829, affirmed 412 F.2d 201 (2d Cir.), certiorari denied 396 U.S. 841.

In respect of 18 of these 22 remaining items petitioner produced no records whatsoever. Moreover, the witnesses asked to testify about these expenses, J. Marshall Brown and William E. Wonders, were unable to recall the time, place, and business purpose of each expense. Indeed, with the exception of general assertions that employees of Jefferson traveled to Washington, D.C., and other places, and that they frequently rented cars, the testimony provided no adequate description of the circumstances surrounding any of these items.[13] Such vague and uncorroborated testimony is wholly insufficient to carry petitioner's burden of proof. Cf. *Norman E. Kennelly,* 56 T.C. 936, 943, affirmed 456 F.2d 1335 (2d Cir.).

As to the final four items—the two for American Express, the one for Eastern Airlines, and the one for Hertz Car Rental—petitioner offered documentary evidence. The evidence in respect of the amounts paid to American Express consisted of itemized charge account statements from the American Express Co., with attached charge records for the various individual items. The statements were addressed to "J Marshall Brown/Marshall Brown Insur." Similarly, the Eastern Airlines documents consisted of a charge account statement with attached copies of charge records for the individual items listed therein. The statement was addressed to "Marshall Brown Insurance Agency, Inc./Attn: J. Marshall Brown." Although these records provide more details of the

---

[13] Brown did identify one item, "Pan Air Corporation," as for the rental of "a plane to go up to Natchitoches, Louisiana, to buy these trailers." Even as to this item, however, the necessary specificity and corroboration were absent.

expenses to which these four items relate, we must nevertheless sustain the Commissioner's disallowance of most of this portion of the travel and entertainment deduction as well. Not only is there little evidence of the business purpose of each expense, but it is impossible to determine, on the basis of the evidence which was presented, what portion, if any, of the American Express and Eastern Airline amounts actually represent expenses incurred on behalf of Jefferson, as opposed to Brown's personal expenses, or expenses attributable to one of the other entities that he controlled. Brown testified that he made trips to Washington and elsewhere in connection with his various businesses, including Jefferson, and his position as a Democratic National Committeeman. However, he also testified that on any one trip his endeavors might pertain to more than one of those activities, and that he maintained no records whatsoever to indicate how much time on any particular trip was devoted to any particular enterprise. Nor could he recall this information at trial. Although it is quite possible that a portion of these travel expenses are properly attributable to Jefferson, we are without authority under section 274 to make an allocation or estimation. In the absence of substantiation as to *each* item— sufficient to satisfy the requirements of section 274 and the regulations thereunder—we must sustain the Commissioner's determination. *Dowell v. United States,* 522 F.2d 708, 712–715 (5th Cir.), certiorari denied 426 U.S. 920; *C. James Mathews,* 61 T.C. 12, 25–27, reversed on another issue 520 F.2d 323 (5th Cir.), certiorari denied 424 U.S. 967; *William F. Sanford,* 50 T.C. at 828.

The situation in respect of the other item for which documentary evidence was presented—the $357.40 Hertz Car Rental expense—is somewhat different. Credible testimony was adduced at trial to the effect that vehicles were rented to visit the hurricane damage sites in Mississippi and Louisiana in connection with the HUD contracts, although here again specific details as to time, place, and the like were absent. This void was not filled by a Dun & Bradstreet collection notice in the amount of $357.40 addressed to Jefferson which also failed to provide the critical details such as time, place, and date of the activities producing the expenditure. Attached to that notice, however, was an invoice from Hertz Truck

Rental in the amount of $155.80 for a 14-foot stake truck. Among other things this invoice, addressed to Jefferson, revealed that for 3 days commencing on November 5, 1969, such a truck was rented with the stated destination of "Local & Miss.," facts which suggest that the truck was used in connection with renting the mobile homes to HUD. In the circumstances we hold that Jefferson was entitled to a deduction in respect of the $155.80.

To recapitulate, we hold that deductions are allowable in the amount of $293.68 paid to T. Jones for legal fees, and the $155.80 paid to Hertz. The Commissioner's disallowance of the remaining amounts claimed as travel and entertainment expenses is sustained.

4. *Surtax exemption.*—Section 1561(a) provides that the "component members of a controlled group of corporations on a December 31, shall, for their taxable years which include such December 31, be limited for purposes of this subtitle to [among other things] one surtax exemption under section 11(d)." It is clear that by reason of the stock of Jefferson, BJR, and Marshall Brown Insurance Agency, Inc., held by J. Marshall Brown on December 31, 1969, those three corporations constituted a "controlled group of corporations" on that December 31.[14] At issue, however, is whether Jefferson was a "component member" of that group.

Section 1563(b)(1) defines "component member" of a controlled group so as not to include those members of the group which are "excluded members." The classes of corporations which are "excluded members" are, in turn, described in section 1563(b)(2). It is petitioner's position that Jefferson was an "excluded member" because on December 31, 1969, it was "a member of such group for less than one-half the number of days in such taxable year which precede such December 31." Sec. 1563(b)(2)(A). Petitioner's contention in effect rests upon an erroneous understanding of the meaning of these statutory words as applied to the facts herein.

Whatever slight ambiguity there may be in respect of the statute, it is fully resolved by the regulations which make it

---

[14] In his deficiency notice the Commissioner determined that Gulf States Public Relations, Inc., was also a member of the controlled group. He has since conceded that it was not.

plain that the phrase "such taxable year" refers to the taxable year *of the corporation* whose status is under consideration. Sec. 1.1563–1(b)(2)(i) and (b)(4), Example (1), Income Tax Regs. Jefferson's taxable year that included December 31, 1969, began 120 days earlier on September 2, 1969. At that time, according to his own testimony, J. Marshall Brown owned less of Jefferson's stock than he did on December 31, by which time he had acquired the stock of at least two other shareholders and increased his holdings to at least 80 percent of the outstanding stock. However, the record does not reveal when these acquisitions took place. Since the burden of proof is on petitioner, we must conclude, in the absence of evidence to the contrary, that on at least one-half of the 120 days preceding December 31, 1969, petitioner held sufficient stock in Jefferson so that it was a member of the group. Accordingly, we hold that on December 31, 1969, Jefferson was a "component member" of a controlled group of corporations consisting of itself, BJR, and Marshall Brown Insurance Agency, Inc. Inasmuch as no consent was filed to apportion the surtax exemption among these corporations, Jefferson was entitled to only one-third of a surtax exemption for its taxable year ended May 31, 1970.

5. *Section 6651(a) addition to tax.* The final issue is whether petitioner is liable for the addition to tax prescribed by section 6651(a) as a result of Jefferson's failure to file a timely return for its taxable year ended May 31, 1970. As we have already held in considering whether the statutory notice of deficiency was timely, it has not been shown that a return was filed on behalf of Jefferson for the period in question before June 19, 1972. Thus, to avoid the addition to tax for late filing, it was incumbent upon petitioner to demonstrate that the failure to file before that date was due to reasonable cause and was not due to willful neglect. Sec. 6651(a); *Lee v. Commissioner,* 227 F.2d 181, 184 (5th Cir.), affirming a Memorandum Opinion of this Court, certiorari denied 351 U.S. 982; *West Virginia Steel Corp.,* 34 T.C. 851, 860; *Coshocton Securities Co.,* 26 T.C. 935, 939.

It may be, as petitioner urges, that J. Marshall Brown believed that a return had been filed in 1970. But it is well settled that willful neglect in failing to file is not a prerequisite to the imposition of the section 6651(a) penalty.

*Lee v. Commissioner, supra* at 184; *West Virginia Steel Corp., supra* at 860; *Beck Chemical Equipment Corp.,* 27 T.C. 840, 858; *Coshocton Securities Co., supra* at 939–940. Even in the absence of willful neglect, petitioner must show that the failure to file occurred despite the exercise of ordinary business care and prudence. Sec. 301.6651–1(c), Proced. & Admin. Regs.; *William H. Mauldin,* 60 T.C. 749, 762; *Estate of William T. Mayer,* 43 T.C. 403, affirmed 351 F.2d 617 (2d Cir.). This has not been done. Quite to the contrary, the testimony on this matter suggests that neither the accountant who purportedly prepared a return in 1970, nor J. Marshall Brown, nor any other employee of Jefferson took steps to ensure that such a return, if there was one, was mailed or otherwise filed. No one could state whether that particular return had in fact been mailed, nor for that matter, did any of the witnesses appear to recall what happened to the return after it had supposedly been prepared by the accountant. In the absence of a satisfactory explanation for the failure to file a timely return, we cannot conclude that the failure was due to reasonable cause, and we must therefore sustain the imposition of the section 6651(a) penalty. Cf. *Logan Lumber Co. v. Commissioner,* 365 F.2d 846, 853–854 (5th Cir.), affirming in part and remanding a Memorandum Opinion of this Court; *Calvert Iron Works Inc.,* 26 T.C. 770, 781–782.

*Decision will be entered under Rule 155.*