ANTON G. NOSEK, III, and KATHLEEN M. NOSEK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nosek v. Commissioner
Docket No. 883-85
United States Tax Court
T.C. Memo 1989-622; 1989 Tax Ct. Memo LEXIS 622; 58 T.C.M. (CCH) 712; T.C.M. (RIA) 89622; November 16, 1989
Montie S. Day, for the petitioners. James W. Clark and Shelleyanne W. L. Chang, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax for taxable years 1977, 1979, and 1980 as follows: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
Sec. 6653(a)
1977
$ 122,311.00
$ 10,987.00
$ 7,902.50    1979
5,717.00
--   285.85   1980
39,783.00
[2] 9,945.75
1,989.15   *623 After concessions, the issues for decision are: (1) whether petitioners are entitled to a claimed distributive share of losses and credits attributable to their partnership interest in Midstates Property Fund (Midstates) -- this issue in turn depends upon whether Midstates actually acquired an ownership interest in real property located in Costa Rica; (2) whether petitioners are liable for an addition to tax under section 6651(a)(1) for failure to timely file their 1977 income tax return; and (3) whether petitioners are liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Anton G. Nosek, III (hereinafter referred to as petitioner), and Kathleen M. Nosek, husband and wife, resided in California at the time they filed their petition. To shelter the gain from the sale of a profitable oil and gas investment in 1977, petitioner sought an investment in a highly leveraged real estate venture. Through an acquaintance, he was informed that Midstates, a *624 California limited partnership to be formed with F. Thomas Little (Little) as its general partner, would purchase income-producing real estate which would offer a five-to-one tax write-off. Limited partnership units in Midstates were sold through a private placement memorandum dated August 24, 1977. The placement memorandum informed potential investors that Midstates had no present investments, options or other contractual arrangements to acquire specific properties. The subscription price for each limited partnership unit was $ 2,000, with a minimum purchase requirement of 5 units. In addition to the payment of the initial subscription price, each limited partner was obligated to make 20 annual contributions to Midstates, each equal in amount to the initial subscription price. Petitioner subscribed to 15 limited partnership units on September 1, 1977. [3] Prior thereto, he had spoken to Peter Chernick (Chernick), tax counsel to Midstates. Chernick informed him that no cash return from an investment in Midstates should be expected. A Certificate of Limited Partnership on *625 behalf of Midstates was filed with the Santa Clara County, California recorder's office. No such filing, however, was made (as required) with the California Secretary of State. Little, Chernick and others were arrested and convicted under 18 U.S.C. section 371 (1982) of conspiring to defraud the Federal government in connection with one of Little's other real estate tax shelters. [4] Following these arrests, respondent's agents obtained a warrant to search Little's business office in San Jose, California. Pursuant to the search warrant, documents relating to a number of partnerships promoted by Little were seized, including three separate files (Real Property Files 3-1, 3-2 and 3-3) containing documents which purported to evidence Midstates' purchase of encumbered, improved real estate located in Costa Rica. Real Property File 3-1 contained an Agreement, purportedly executed on June 25, 1977, pursuant to which Midstates was to acquire a commercial building for $ 4,200,000, payable $ 15,000 at the close *626 of escrow, $ 185,000 on or before December 15, 1977, and the balance, together with interest, payable annually over a 20-year period. The Agreement specified that the parties would execute a Contract of Sale which would reflect the purchase price payable in Costa Rican currency. The file also contained an executed copy of the Contract of Sale purportedly dated September 1, 1977. Such Contract of Sale was neither witnessed nor notarized and no documentary stamps were affixed. Also included in Real Property File 3-1 was an unexecuted and incomplete copy of a promissory note payable by Midstates to Financiera Del Agro, S.A. in an amount equal to the sum due on December 15, 1977 from Midstates to the putative seller. In addition, File 3-1 contained a Property Management Agreement between Midstates and Vicar, S.A. pursuant to which Vicar purportedly agreed to manage the realty acquired by Midstates for a monthly fee of $ 2,800. Also included in the file were two documents from Vicar to Midstates which appear to be operating statements [5] and an insurance policy issued by the International Investment Insurance Company of Costa Rica purporting to insure both Midstates' and the selling *627 corporation's interests in the property. (In Costa Rica, only the state controlled insurance company is authorized to issue insurance policies; the insurance policy found in Midstates' files was not issued by the state controlled company.) Real Property Files 3-2 and 3-3 contained documentation similar to that contained in File 3-1, the only difference being the dollar amounts involved. Midstates did not employ any experts, legal or otherwise, familiar with Costa Rican real estate transactions. Petitioners presented no evidence to support a finding that payments were in fact made by Midstates to the putative sellers of the real property identified in Files 3-1, 3-2 and 3-3. Also seized from Little's office were documents which indicate that in 1980 Midstates sold all of its real property in Costa Rica to Senator Hernan Castro (Castro) for $ 17,200,000. [6] The genuineness of such a sale is suspicious. No evidence was offered that Midstates received any payments from Castro as a result of the alleged sale. Respondent *628 presented the testimony of Luis Tinoco (Tinoco), an expert on Costa Rican law and real estate practices. In February, 1984, Tinoco performed a title search of the National Register of Costa Rica, the location where deeds, mortgages and other documents affecting Costa Rican real property interests are recorded. Tinoco determined that as of such date Midstates was not a record owner, mortgagor or mortgages with respect to any of the properties described in Files 3-1, 3-2 and 3-3. Tinoco also determined that Castro was not the record owner of the real property described in Files 3-1, 3-2 and 3-3 and that no mortgages were recorded in favor of Financiera Del Agro with respect to such real property. Under Costa Rican law, documents must be notarized by a Costa Rican notary public and must have documentary stamps affixed in order to be in recordable form. Further, under Costa Rican law, the right to possession of real estate rests solely with the record owner in the National Register. Petitioners deducted for each of the years in issue their distributive share of Midstates' purported losses and tax credits; respondent disallowed the claimed deductions. Petitioners obtained extensions *629 of time to file their 1977, 1979 and 1980 income tax returns. Their 1979 and 1980 income tax returns were filed within the extension period granted by respondent. Petitioners were granted until August 15, 1978 to file their 1977 tax return; they did not file such return until September 20, 1978. The reason petitioners give for filing their 1977 income tax return late is that Kathleen Nosek, who was responsible for gathering all of petitioners' tax information and submitting the same to their accountant, was unable to do so because she gave birth to a child on August 14, 1978. OPINION The first issue for decision is whether Midstates actually acquired an ownership interest in three Costa Rican properties. Respondent argues that Midstates did not, in fact, acquire such properties and that the documentation which purports to evidence such transactions should be disregarded. Petitioners contend otherwise. The transactions purportedly entered into by Midstates are highly suspicious due to the myriad of unexplained discrepancies. First, the placement memorandum through which limited partnership units in Midstates were offered for sale stated that as of August 24, 1977, Midstates *630 had no investments, options or contractual arrangements to acquire specific properties. Yet, the agreements pursuant to which Midstates was to acquire buildings in Costa Rica are dated June 25, 1977. Second, none of the documents purporting to evidence Midstates' acquisition of Costa Rican properties were recorded in the National Register and could not have been so recorded because they were not executed in recordable form. And finally, the insurance policies, which purport to insure Midstates' interest in the properties, were not issued by the state controlled insurance company. In addition, petitioners failed to prove that any amounts were actually paid by Midstates to the purported sellers of the Costa Rican realty. While Chernick testified that he prepared many of the documents allegedly utilized by Midstates, his testimony was of little probative value in determining whether Midstates actually acquired any interest in the realty in question. On the record before us, we conclude that Midstates engaged in the "expedient of drawing up papers to characterize the transactions in question as something contrary to the economic realities thereof, solely to obtain unallowable tax *631 benefits." Falsetti v. Commissioner, 85 T.C. 332, 335 (1985). In other words, Midstates' purported transactions "weren't worth the paper they were written on." Because petitioners failed to prove the transactions actually occurred as claimed, we sustain respondent's determinations as to the underlying deficiencies. In their petition, petitioners aver that in the event they are not entitled to deduct their share of partnership losses from their investment in Midstates, then, alternatively, they are entitled to a theft loss under section 165. They failed to address this issue at trial and they chose not to file any briefs. Consequently, we deem that they have abandoned their alternative position. Respondent determined additions to tax under sections 6651(a)(1) and 6653(a). Section 6651(a)(1) imposes an addition to tax when a taxpayer fails to timely file a return, unless such failure is due to reasonable cause and is not due to willful neglect. Petitioners bear the burden of proving that the section 6651(a)(1) addition to tax does not apply. BJR Corp. v. Commissioner, 67 T.C. 111, 130 (1976); Shomaker v. Commissioner, 38 T.C. 192, 202 (1962). *632 Petitioners, after securing an extension of time to file their 1977 return until August 15, 1978, filed their return on September 20, 1978. The excuse given by petitioners is insufficient to establish that the failure to file their 1977 return by August 15, 1978 was due to reasonable cause. Accordingly, we sustain respondent's determination as to the section 6651(a)(1) addition to tax. Section 6653(a) provides for an addition to tax for negligence or disregard of rules and regulations. Negligence under section 6653(a) is defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Considering the record as a whole, we are unable to conclude that petitioners knew or should have known of the fictitious nature of the transactions in which Midstates was involved. Accordingly, we find that petitioners are not liable for the addition to tax under section 6653(a) for the years in issue. To reflect the foregoing and the concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Respondent has conceded that petitioners are not liable for the addition to tax under section 6651(a)(1) for 1980.↩
3. Petitioner allegedly sold 10 of these limited partnership units to William C. Gordon in 1981.↩
4. These convictions were affirmed by the Ninth Circuit Court of Appeals. United States v. Little, 753 F.2d 1420↩ (9th Cir. 1984).
5. The documents are in Spanish.↩
6. Use of the title "Senator" is unusual because members of Costa Rica's unicameral legislature are called congressmen.↩