CHARLES O. COOLEY AND LORNELL COOLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cooley v. Commissioner
Docket No. 4621-79, 20189-82.
United States Tax Court
T.C. Memo 1986-423; 1986 Tax Ct. Memo LEXIS 187; 52 T.C.M. (CCH) 411; T.C.M. (RIA) 86423; September 9, 1986. Charles O. Cooley and Lornell Cooley, pro se. Robert A. Johnson, for the respondent. SHIELDS
*190 MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In these cases which have been consolidated for trial, briefing and opinion, respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: CHARLES O. COOLEY
Additions to Tax
Year
Deficiency
Section 6653(b) [1]
1969
* $23,059.00
$11,530.00
1970
40,975.00
20,488.00
1971
1,403.00
704.00
1974
578.00
289.00
1975
1,301.00
650.00
1978
565.00
282.00
LORNELL COOLEY
Additions to Tax
Additions to Tax
Year
Deficiency
Section 6651(a)
Section 6653(a)
1969
* $23,062.00
$5,766.00
1970
40,975.00
10,244.00
1971
1,403.00
351.00
$70.00
1974
578.00
140.00
29.00
1975
1,301.00
306.00
65.00
1978
565.00
141.25
28.25
After *191 concessions, the issues remaining for decision are: (1) whether petitioners are entitled to a jury trial in this Court; (2) whether requiring petitioners to file proper income tax returns and to disclose their correct income and expenses there on and in this Court violates their rights under the Fifth Amendment; (3) whether commissions on life insurance policies purchased by petitioners Charles O. Cooley for himself and members of his family constitute gross income; (4) whether property received in lieu of life insurance commissions constitutes gross income; (5) whether petitioners are entitled to losses for the worthlessness of certain stock and partnership interests previously received in lieu of insurance commissions; (6) whether petitioners are entitled to certain miscellaneous deductions in 1969 and 1971; (7) whether petitioner Charles O. Cooley is liable for additions to tax for all years for fraud under section 6653(b) or, in the alternative, for failing to file timely returns under section 6651(a) or for negligence under section 6653(a); and (8) whether petitioner Lornell Cooley is liable for additions to tax under section 6651(a) for failing to file timely *192 returns and additions to tax under section 6653(a) for negligence. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by reference. Petitioners, Charles O. Cooley and Lornell Cooley, husband and wife, resided in Arizona during the years 1969 through 1978 and at the time they filed their petitions. During the years under consideration Lornell Cooley was a housewife and had no separate income but under the community property laws of Arizona she has a vested interest [2] in one-half of the earnings of Charles O. Cooley, who is hereinafter referred to as petitioner. Petitioner was born about 1930 and was raised on his father's farm. His formal education ceased with the eighth grade, but he later acquired a high school equivalency certificate. Prior to becoming an insurance agent in about 1966, he was employed as a farmer, a policeman, and a concrete worker. Lornell Cooley has a high school education. Up to the date of trial her only employment had been for a few months in a meat department. Neither of them have had any education *193 or experience in bookkeeping or accounting. For 1967 they filed a proper joint income tax return on the cash basis which reflected gross commissions from insurance sales by petitioner of $12,552 and a net profit of $6,755. For 1968 they again filed a proper joint return on the cash basis reflecting gross commissions from the same source of $19,469 and a net profit of $12,959. On both returns they claimed exemptions for six children whose ages at that time ranged from approximately nine to approximately eighteen. Neither petitioner filed an income tax return for 1969, 1970, 1971, 1974, 1975, 1976, and 1978. Charles O. Cooley filed a Form 1040 for each of the years 1971, 1974, and 1975 in May of 1977. The Forms 1040, however, did not constitute income tax returns because they disclosed only his name and contained no information from which his income or income tax liability could be computed. [3] Instead, each line on the returns contained the phrase "Object -- Self-incrimination." The Forms 1040 were accompanied by newspaper clippings, court opinions, and Congressional reports supposedly in support of his failure to provide return information. These Forms 1040 were filed after *194 Mr. Cooley had completed the sentence he received upon his conviction in January of 1975 of having willfully failed to file returns for 1969 and 1970 in violation of section 7203. During 1969, 1970 and 1971, petitioner did business in the Phoenix area as Cooley Insurance Agency and World Wide Life Insurance and Trade Agency. During these years, he sold life insurance for Financial International Consultants Corp. ("Financial"), the Beneficial Life Insurance Company ("Beneficial"), Tollica -- the Old Line Life Insurance Company of America ("Tollica"), Northwestern National Life Insurance Co. ("Northwestern"), North American Life & Casualty ("North American") and Wabash Life Insurance Company ("Wabash"). During 1969 petitioner received commission checks from Beneficial totaling $9,070 after payroll deductions reflected on the checks in the following amounts: Payroll Deduction
Amount
Life Insurance
$ 10.50
Health Insurance
97.00
Policy Fees
228.56
License & Supplies
192.75
Inspection Fees
19.15
FICA
374.40
TOTAL
$922.91
*195 During 1970 petitioner received commission checks from Beneficial in the total amount of $12,680.31 after payroll deductions which were reflected on the checks in the following amounts: Payroll Deduction
Amount
Life Insurance
$ 98.70
Health Insurance
106.25
Policy Fees
78.14
License & Supplies
43.00
Inspection Fee
3.00
FICA
374.40
Interest Expensed
230.35
Disability Income
Protection
36.75
Group Retirement
1,210.18
TOTAL
$2,180.76
During 1971 petitioner received commission checks from Beneficial in the total amount of $4,409.72. During 1969 petitioner received commission checks from Financial totaling $6,640.29. During 1970 petitioner received commission checks from Financial totaling $8,148.96 and a check for $1,000 in settlement of a prize which petitioner had won in a sales contest. He was also reimbursed $20.00 for a medical fee previously deducted by Financial. For the years 1969, 1970, and 1971 petitioner received Forms 1099 from Beneficial showing he had earned commissions of $9,278.47, $122,012.30, and $25,256.31, respectively. For 1969 petitioner received a Form 1099 for insurance sold for Financial which reflected total earned *196 commissions of $94,313.02. This Form 1099 was actually issued by Northwestern National Life Insurance Company because that was the contract carrier through whom Financial had placed the insurance. For 1970 petitioner received two Forms 1099 for commissions on insurance sold for Financial totaling $43,559.54. For 1971 petitioner received a Form 1099 from Financial showing total commissions of $2,398.73. The parties have stipulated that the 1099's for 1969 and 1970 include commissions on policies which were later cancelled or reversed by the issuing company. Consequently petitioner's commissions as shown on the 1099's for 1969 and 1970 are overstated by $9,995.30 and $8,583.74, respectively. The parties also agree that payment was received in 1970 by petitioner on 24 policies written in 1969 on which the commissions totaled $54,881.44, which commissions are included in the Forms 1099 for 1969. For 1969 and 1970 petitioner received commission checks from Wabash in the respective amounts of $163.40 and $106.66. For the same years petitioner received commission checks from Tollica in the respective amounts of $97.37 and $29.07. During the same years petitioner received commission *197 checks from North American Life and Casualty in the total amounts of $154.27 and $114.11, respectively. During 1974, 1975, and 1976 petitioner was employed by Magma Copper Company and received wages in the amounts of $11,595, $19,487, and $5,895 respectively. On May 2, 1974 petitioner gave Magma a Form W-4, Employee Withholding Exemption Certificate, on which he claimed 30 exemptions. At that time he knew he was not entitled to 30 exemptions and by filing the Form W-4 he intended to stop the withholding of Federal income tax from his wages. During 1978 petitioner worked for Old West Development, Oakwood Construction Company, and Brewer Construction Company and received wages in the respective amounts of $6,398.75, $897.75, and $6,000.50. On June 28, 1978 he filed a Form W-4E, Exemption from Withholding, with his employer Old West Development Corporation in which he indicated that he had incurred no income tax liability for 1977 and did not anticipate any tax liability for 1978. As an agent for both Financial and Beneficial, petitioner was entitled to 50% of the first year's premium on any policy he sold as his commission. Furthermore he was required to remit to the company *198 only the difference between the premium and the commission. When a policy was "netted" by petitioner in this manner, either Financial or Beneficial would credit his premium account with a full commission without knowing whether and in what manner he collected the commission from the insured. Consequently a Form 1099 issued by either one of these companies to petitioner reflected commissions which he had earned during the year but did not reflect the amount of commissions actually collected by petitioner on netted policies. Many of the commissions shown on the Forms 1099 issued to petitioner by both Beneficial and Financial were netted by petitioner and can be divided into the following categories: (1) Commissions on policies acquired by petitioner for himself or members of his family. See Appendices A and B. (2) Commissions on policies purchased by certain parties in exchange for interests in limited partnerships known as Sonel Precious Metals (Sonel), Arizona Patent Investors (Investors), Trideca II, Aqualectra and Alphalite Enterprises. See Appendices A and B. (3) Policies purchased by William Vaughn Ellsworth ("Ellsworth") for himself, his family, his company and others, *199 in exchange for limited partnership interests or as stock in Silver Lue Mining, Inc. (Silver Lue). See Appendix B. (4) Policies purchased by individuals in exchange for legal services, a vacuum cleaner, radio advertising, and stocks in Systems General Corp. (Systems), Sierra Trading Corporation (Sierra), and DeLong Modular Systems (DeLong). See Appendices A, B and C. (5) Policies on which the insureds failed to pay anything to petitioner.See Appendix B. At the time he accepted the stocks and partnership interests in payment for commissions petitioner believed that the property received in each case had a value equal to the commissions. In Ellsworth's case, however, he became convinced shortly afterwards that the partnership interests were in fact worthless and brought suit against Ellsworth and several others for payment of his commissions. Ellsworth was the president of Sonel Research and Development Corporation (Sonel Corporation) which, in turn, was the general partner in Sonel, Aqualectra, Trideca II and Arizona Patents. Sonel Corporation and the partnerships were "closely involved" with Silver Lue. All of these interrelated partnerships and corporations were involved *200 in such ventures as a steam powered automobile, expeditions to Haiti in search of buried treasure, neon signs to be mounted on trucks, and devices which were supposed to turn low grade ore into high grade ore. In settlement of the suit against him, Ellsworth gave petitioner 100,000 shares of Vedco Wah Wah stock. The settlement of the suit occurred before the end of 1970. In 1971, petitioner received 14,000 shares of stock in Sierra in lieu of commissions on policies sold to the Lucas family. See Appendix C. Unknown to petitioner when he received these shares in 1971, Sierra was already in bankruptcy. While petitioner thought that the shares had some value, they were in fact worthless. During the audit and criminal investigation with respect to his liability for 1969 and 1970 petitioner repeatedly failed or refused to produce any books or records of his business activities. During the audit of his tax liability for the subsequent years of 1971, 1974, 1975, 1976 and 1978 he again failed or refused to produce any books and records or to cooperate in any way with respondent's agents. He continued to refuse to cooperate after these cases were set for trial and in preparation *201 for trial he repeatedly refused to confer with counsel for respondent in the preparation of stipulations and the production of documents unless and until ordered to do so by the Court. In separate statutory notices mailed to petitioners on February 5, 1979 respondent determined that petitioners had income in 1969 and 1970 from insurance commissions as shown below. 1969
1970
Beneficial
Checks to petitioner
$9,070.00
$ 14,702.00
Commissions netted by petitioner
206.00
103,384.00
Bonus
950.00
Deductions
716.00
825.00
$9,992.00
* $121,657.00
Financial
Checks
6,640.00
8,149.00
Prize
1,000.00
Commissions netted by petitioner
86,580.00
35,079.00
Deductions
20.00
93,220.00
44,248.00
Wasbash checks
163.00
107.00
Tollica checks
97.00
29.00
North American checks
154.00
114.00
Ivan Nelson - club checks
1,066.00
Total Commission Income
103,626.00
* 167,221.00
Allocated to Lornell Cooley (50%)
51,813.00
83,611.00
Allocated to Charles O. Cooley (50%)
51,813.00
83,611.00
In separate statutory notices mailed to petitioners on May 18, 1982 respondent *202 determined that petitioners had income in 1971, 1974, 1975, 1976, and 1978 from insurance commissions and wages as follows: 1971
1974
1975
1976
1978
Commissions: Beneficial
(1099s)
$20,192.00
Financial
1,616.00
Wages: Magna
11,595.00
19,487.00
5,895.00
Old West
6,398.75
Oakwood
897.75
Brewer
4,476.50
Totals
21,808.00
11,595.00
19,487.00
5,895.00
11,773.00
To Lornell
10,904.00
5,797.00
9,744.00
2,947.00
5,886.50
To Charles
10,904.00
5,797.00
9,744.00
2,947.00
5,886.50
OPINION Jury Trial
Petitioners' contention that this Court's refusal to grant them a trial by jury violates their constitutional rights is without merit. Olshausen v. Commissioner,273 F.2d 23 (9th Cir. 1959), cert. denied 363 U.S. 820 (1960), rehearing denied 364 U.S. 855; Rowlee v. Commissioner,80 T.C. 1111 (1983); and Swanson v. commissioner,65 T.C. 1180 (1976). Fifth Amendment
Petitioners' contention that requiring them to keep records, file returns, and establish in this Court their correct income and deductible *203 expenses would violate their rights under the Fifth Amendment is also without merit. This is especially true where as here they were assured in open court that at the time of trial they were not the target of any criminal investigation by the respondent. Rogers v. United States,340 U.S. 367 (1951); Roberts v. Commissioner,62 T.C. 834 (1974); Figueiredo v. Commissioner,54 T.C. 1508 (1970), affirmed in an unpublished opinion (9th Cir., Mar. 14, 1973). Policies Purchased by Petitioner
During 1969 and 1970, petitioner purchased certain policies from Financial and Beneficial for himself and members of his family. The premium on each policy was netted by petitioner inasmuch as he only forwarded to the company the net amount due after deducting any commission due him. Petitioner obviously performed a service to the insurance companies when he purchased such policies and in similar situations we have concluded "[p]etitioner obtained the benefit of the commissions by remitting only the net premiums on these policies to the companies, consequently the amount which normally would be payable is taxable to petitioner as *204 compensation." Bailey v. Commissioner,41 T.C. 663, 666 (1964). See also Commissioner v. Minzer,279 F.2d 338 (5th Cir. 1960), revg. 31 T.C. 1130 (1959). The same conclusion is applicable here. Property Received in Lieu of Commissions
On brief, petitioners do not attempt to refute respondent's assertion that the receipt of property in lieu of commissions constitutes income. Instead petitioners contend that the property received had no ascertainable value; therefore, the receipt of such property constituted the receipt of zero income. Respondent contends that petitioners received gross income equal to the amount of commissions as established by the Forms 1099 of Beneficial and Financial, less the commissions on cancelled policies. Petitioners bear the burden of proving that the value of the property or services received in lieu of cash commissions was less than the amount determined by respondent. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). *205 Under section 61(a) "gross income means all income from whatever source derived." Section 1.61-2(d), Income Tax Regs. provides in part, that: [I]f services are paid for in property, the fair market value of the property taken in payment must be included in income as compensation. If services are paid for in exchange for other services, the fair market value of such other services taken in payment must be included in income as compensation. If the services are rendered at a stipulated price, such price will be presumed to be the fair market value of the compensation received in the absence of evidence to the contrary * * *. [Emphasis added.] With respect to 1969, there is no evidence in the record that the property received by petitioner in exchange for commissions was not of equal value to the commissions that petitioner was entitled to as shown on his Forms 1099. We conclude, therefore, that with respect to 1969 petitioners have failed to meet their burden of proving that the value of the property actually received in 1969 was less than the commissions petitioner was entitled to receive from Beneficial and Financial. We are convinced, however, *206 that in 1970 and 1971 petitioner received property in some instances which was not equal in value to the commissions he was entitled to receive. Nevertheless he thought that the property and the commissions were of equal value and therefore no unlawful discount occurred under Ariz. Rev. Stat. Ann. section 20-499 (1976). The sales made by him through Ellsworth are a good example. Ellsworth, the key individual in all of the partnerships, testified that an individual who had pledged to advance one million dollars to Arizona Patents decided in October 1969 not to honor the pledge. Consequently, Arizona Patents began to experience severe financial problems in early December 1969. Having counted on this pledge to provide an influx of new capital, the interrelated partnerships and Silver Lue, also began to suffer severe financial difficulties by the end of 1969. However, Ellsworth also testified that he and the other partners still had expectations of keeping all of the partnerships and Silver Lue in operation into the early part of 1970 and did not give up these attempts until the summer of 1970. Having found Ellsworth's testimony to be straight forward and credible, we conclude *207 that the partnership interests and Silver Lue stock received by petitioner during 1970 were in fact worthless when he received them. [4] Accordingly, the value of the properties, i.e., the partnership interests and the Silver Lue stock, received in lieu of commissions and hence the gross income represented by such properties was zero. Since we have found that Sierra was in bankruptcy and its stock was worthless when received by petitioner in 1971 the amount of income attributable to it is also zero. With the exceptions noted above there is no evidence in the record that any other property received in lieu of commissions did not in fact equal the amount of the commissions during the year of receipt. Consequently, petitioners have failed to carry their burden of proving that their income with respect to any other such properties is not equal to the commissions petitioner would have otherwise received. Losses arising from stocks and partnership interests previously received.
Petitioners contend that any corporate stocks and partnership *208 interests treated as income because they were received in lieu of cash commissions, but which subsequently became worthless, entitled them to ordinary losses to the extent such stocks and partnership interests were included in income. In this connection they claim losses on the stocks in Silver Lue, Vedco Wah Wah, Systems, DeLong, and Sierra, all of which they assert were section 1244 stocks. [5] We have already concluded herein that the stocks in Silver Lue and Sierra were worthless when received; therefore, petitioners acquired no basis in such stocks on which a loss can be claimed. Furthermore, petitioners have no basis to claim as a loss in their Vedco Wah Wah stock since respondent has not asserted any value for it when received in settlement of the suit against Ellsworth. Consequently, petitioners' claims with respect to section 1244 losses apply only to the stocks in Systems and DeLong. *209 A loss on section 1244 stock is treated as a "loss from the sale or exchange of an asset which is not a capital asset." Section 1244(a). Petitioners, however, have failed to present any evidence which tends to establish that losses occurred with respect to the stocks in Systems and DeLong or that such stocks were in fact "section 1244 stock" as defined in section 1244(c)(1). Having failed to carry their burden of proof, petitioners are not entitled to losses on these stocks. We have concluded hereinbefore that the partnership interests received by petitioners in 1969 had a value equal to the commissions for which they were received. We have also previously concluded that the partnership interests became worthless in 1970. Hence, to the extent they are taxable in 1969, they constitute a loss in 1970. Petitioners contend the loss in 1970 is deductible in full under section 165(c) while respondent contends that such loss is a loss from the sale or exchange of a capital asset under section 165(f). [6]
*210 Section 165(c) allows individuals to take deductions in full for losses incurred in a trade or business or in a transaction entered into for profit. However, under section 165(f) any loss arising from the sale or exchange of a capital asset, is limited by sections 1211 and 1212. We have found that the partnership interests were acquired in 1969 by petitioners in lieu of commissions having an equal value. Thereafter such interests were held by petitioners as capital assets. Section 741. It has been held that under certain circumstances the loss on the abandonment or forfeiture of a partnership interest may constitute an ordinary loss. See Zeeman v. United States,275 F.Supp. 235, 253 (S.D.N.Y. 1967), modified on another issue 395 F.2d 861 (2d Cir. 1968); Hutcheson v. Commissioner,17 T.C. 14 (1951); Gannon v. Commissioner,16 T.C. 1134 (1951). Petitioners, however, have failed to establish that the circumstances which permit ordinary loss treatment are present in this case. Consequently, their losses on the partnership *211 interests constitute capital losses under section 165(f). See O'Brien v. Commissioner,77 T.C. 113 (1981); Stilwell v. Commissioner,46 T.C. 247 (1966). Miscellaneous Deductions
Petitioners argue that they are entitled to deductions for legal fees in 1969 totaling $1,545 and deductions totaling $7,810 in 1971 for radio advertising and an educational kit all of which they contend were received in exchange for commissions. Deductions are a matter of legislative grace and petitioners have the burden of proving that they are entitled to the deductions. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); Rule 142(a). Petitioners, however, have failed to offer any evidence from which we can conclude that the claimed amounts were actually spent, or if spent, were deductible expenditures. Consequently, petitioners have failed to meet their burden of proof and are not entitled to the claimed deductions. Fraud
Respondent has asserted that petitioner, Charles O. Cooley, is liable for the additions to tax for fraud as provided by section 6653(b) for all years in issue. On this issue *212 respondent has the burden of proving by clear and convincing evidence, that there was some underpayment in each year and that some part of the underpayment for each year was due to fraud. Section 7454(a); Rule 142(b). The burden with respect to fraud is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The presence or absence of fraud is a question of fact to be determined from the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed but must be established by affirmative evidence. *213 Beaver v. Commissioner,55 T.C. 85 (1970). It may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may be examined to determine whether the fraudulent intent is present. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Petitioner's position with respect to the addition to tax for fraud was well stated by Mr. Cooley in the summation of his testimony. An excerpt from the transcript containing such summary is set forth in the margin. [7]
*214 Unfortunately, however, Mr. Cooley's actions as set forth in our findings speak just as eloquently and a great deal louder than the words used in his summation. Such actions commenced in 1969 at some point after he joined with his wife in filing an income tax return for 1968 in which he properly reported insurance commissions and continued through the trial. They include the following: (1) The willful failure of the petitioner to file income tax returns for 1969 and 1970 even though he received both checks and Forms 1099 indicating that during each taxable year he earned insurance commissions totaling several thousands of dollars; (2) The failure of petitioner to file a return for 1971 even though he received both checks and Forms 1099 indicating that during the taxable year he earned insurance commissions totaling several thousands of dollars and at the time the return was due he was being investigated by respondent's agents for failing to file returns for 1969 and 1970; (3) The failure of petitioner to file returns for 1974, 1975, 1976, and 1978 even though he had received both payments and Forms W-2 indicating that during each taxable year he earned wages totaling several *215 thousands of dollars, with the failures for such years occurring after his conviction for willfully failing to file returns for 1969 and 1970; (4) Again, after his conviction for the earlier years, he filed Porth-type Forms 1040 for 1971, 1974, and 1975, even though Porth's arguments had been previously rejected by the District Court and the Court of Appeals and the Supreme Court had refused to review their rejection; (5) During 1969, 1970, and 1971, petitioner engaged in numerous bartering situations where he exchanged taxable insurance commissions for stocks, partnership interests, radio time, vacuum cleaners, the down payment on a home, and other property and services, the effect of which was to conceal the nature and amount of his income; (6) During 1974 petitioner filed a false Form W-4 with his employer, Magma Copper Company, with the intention of preventing the withholding of income tax from his wages; (7) During 1978 petitioner filed a false Form W-4E with his employer, Old West Development Corporation, with a similar intention; (8) During the investigation of his income tax liability for the years 1969 through 1978, petitioner failed to produce any books and records *216 which reflected his income and expenses; (9) During the determination of his income tax liability, petitioner refused to cooperate with respondent's agents in any way; (10) In violation of the Rules of Practice and Procedure before this Court, petitioner failed to cooperate in the preparation of these cases for trial and refused to produce documents for inspection by respondent's counsel and to stipulate uncontroverted facts unless and until ordered to do so by the Court; and (11) Petitioner systematically attempted to avoid the trial of these cases as long as possible. From the above actions and the record in these cases as a whole, we are satisfied that in spite of his strident protestations to the contrary petitioner over the years was not motivated by a sincere desire to change what he perceived as an unfair or unconstitutional law. Instead we are convinced that in such conduct he was primarily motivated by a desire to conceal, evade, and defeat the payment of any income tax which he might owe for any year from 1969 through 1978. See Rowlee v. Commissioner,80 T.C. 1111, 1125-1126 (1983). Furthermore, the fact that respondent has failed or been unable *217 to assert deficiencies for some of such years is of no consequences because such failure is undoubtedly due to the refusal of petitioner to keep or produce proper records and to cooperate in the determination of his tax liability. We conclude, therefore, that for any year before us in which a computation under Rule 155 reflects a deficiency, respondent has established by clear and convicing evidence that such deficiency is due to the fraudulent acts of petitioner, Charles O. Cooley, and that respondent's determination that he is liable for the addition to tax under section 6653(b) is correct and should be sustained. In view of our conclusin with respect to the fraud issue, we do not need to consider respondent's alternative assertion against petitioner of the additions to tax under section 6651(a) and section 6653(a). Failure to File
In his statutory notice respondent determined that petitioner Lornell Cooley was liable for the additions to tax provided by section 6651(a) for failing to file a timely income tax return for each of the years under consideration. She has the burden of proving that respondent's determination is erroneous. BJR Corp. v. Commissioner,67 T.C. 111, 131 (1976); *218 Rule 142(a). Lornell Cooley did not appear at the trial. Consequently, we do not have the benefit of her testimony as to why she did not file returns. However, she joined in the vague and confused constitutional arguments set forth in Mr. Cooley's briefs apparently as a basis for having failed to file timely returns. We have already found that these arguments have no merit. Therefore they do not constitute reasonable cause for having failed to file timely returns. See Muste v. Commissioner,35 T.C. 913 (1961). Respondent's determination with respect to this issue is sustained for any year before us in which a computation under Rule 155 reflects a deficiency. Negligence
Petitioner Lornell Cooley also has the burden of proving that respondent erroneously determined that she was liable under section 6653(a) for the addition to tax for negligence. Otis v. Commissioner,73 T.C. 671, 675 (1980) affd. without published opinion 655 F.2d 1053 (9th Cir. 1981); Rule 142(a). Here again, she offers only vague and confusing constitutional arguments in opposition to the addition to tax. As we have previously found, these arguments *219 are completely without merit and consequently respondent's determination with respect to the addition to tax under section 6653(a) is sustained for any year before us in which a computation under Rule 155 reflects a deficiency. Decisions will be entered under Rule 155.
APPENDIX A 1969
POLICY HOLDER
INSURANCE
DATE OF
and/or INSURED
COMPANY
POLICY
COMMISSION
PROPERTY RECEIVED
Charles Cooley
F
10-31-69
$2,022.30)
Charles Cooley
F
10-31-69
2,056.60)
None
Sidney A. Cooley
F
11-30-69
511.20)
Katherine Harmon
F
10-31-69
902.65)
.030% SonelPrecious Metals
Clyde Harmon
F
10-31-69
2,129.40)
Marion Vance
F
10-31-69
3,359.30)
Elizabeth A. Vance
F
10-31-69
2,768.50)
.015% Trideca II
Paul Vance
F
11-15-69
2,277.00)
Betty J. Merkley
F
10-31-69
2,370.90)
Zane Merkley
F
11-30-69
5,296.20)
.020% Arizona Patent Investors
Zane Merkley
F
12-15-69
1,990.45)
Gary Burke Larson
F
12-15-69
1,799.00)
Legal Services
APPENDIX B 1970
POLICY HOLDER
INSURANCE
DATE OF
and/or INSURED
COMPANY
POLICY
COMMISSION
PROPERTY RECEIVED
Ariel Freeman Cooley
B
05-11-70
$4,007.00)
Ariel Freeman Cooley
B
02-06-70
2,050.00)
Marvin Cooley
F
05-15-70
1,660.45)
None
Charles Cooley
F
08-15-70
450.40)
Charles Cooley
F
08-31-70
337.05)
Sidney Cooley
F
12-30-80
29.82)
Grant Ellsworth
F
10-31-69
5,503.40)
Julia P. Ellsworth
F
10-31-69
2,559.20)
Fern E. Ellsworth
F
10-31-69
2,559.20)
Wm. V. Ellsworth
F
12-15-69
7,784.00)
Wm. Vaughn Ellsworth
F
12-15-69
3,895.50)
Cecilia K. Ellsworth
F
12-30-69
1,544.20)
J. L. Ellsworth
F
12-30-69
3,368.40)
Elmo Porter
F
11-15-69
3,802.40)
Ruth Boswell
F
12-30-69
1,565.40)
Jerry C. Henderson
F
12-30-69
1,988.00)
Helen Henderson
F
12-30-69
1,066.45)
Sonal Research & Dev.
B
02-20-70
934.00)
10,000 shares Silver
Lue Mining, Inc.
Ellsworth Brothers
B
02-21-70
6,620.00)
.20% Aqualectra, L.P.
Ellsworth Brothers
B
02-21-70
2,930.00)
.10% Trideca II, L.P.
W. Vaughn Ellsworth
B
05-09-70
4,022.50)
.20% Sonel Precious
Metals Partners, L.P.
Grant L. Ellsworth
B
05-18-70
836.50)
.16% Arizona Patent
Investors, L.P.
W. Vaughn Ellsworth
B
05-18-70
804.50)
.12% Arizona Patent
Investors, L.P.
Sonel Research & Dev.
B
05-21-70
3,229.00)
.20% Sonal Precious
Metals Partners, L.P.
Sonel Research & Dev.
B
06-06-70
1,206.00)
.10% Trideca II L.P.
Sonel Research & Dev.
B
06-13-70
956.50)
.12% Aqalectra, L.P.
Sonel Research & Dev.
B
06-16-70
3,472.50)
Julien W. Cummings
B
06-16-70
1,215.50)
Grant Ronald Ellsworth
B
06-18-70
6,620.00)
Julia Ellsworth
F
06-30-70
2,559.20)
Fern Ellsworth
F
06-30-70
2,660.70)
Fern Ellsworth
F
11-15-70
731.20)
Sonel Research & Dev.
B
Unknown
Unknown)
Vaughn Ellsworth
B
Unknown
Unknown)
Elmo Porter
F
09-30-70
1,928.23)
John Leslie
B
05-11-70
397.75)
John T. Leslie
B
06-16-70
956.00)
George Merrill Roy, Jr.
B
06-06-70
1,206.00)
Dick Boswell
B
05-01-70
1,909.50)
Bruce Jay Hancock
F
11-30-69
$1,156.12)
Bruce Jay Hancock
F
11-30-69
1,922.20)
Hancock Dev. Corp.
B
01-29-70
1,031.00)
Hancock Dev. Corp.
B
01-29-70
1,031.00)
Hancock Dev. Corp.
B
02-20-70
1,841.00)
Hancock Dev. Corp.
B
02-12-70
1,242.00)
Eddie Lional Hancock
B
02-20-70
1,841.00)
.040% Trideca II, L.P.
Hancock Dev. Corp.
B
Unknown
Unknown)
Hancock Dev. Corp.
B
Unknown
Unknown)
Lloyd Earl Hancock
B
Unknown
Unknown)
Hancock Dev. Corp.
B
Unknown
Unknown)
Joanne Dunn
B
01-29-70
515.50)
Archie L. Newport
B
01-29-70
515.50)
Kenway E. Dick
B
Unknown
Unknown
Vacuum Cleaner
Lee William Heiner
B
01-28-70
3,090.00)
.020% Aqualectra, L.P.
Lee W. Heiner.
F
01-30-70
5,490.80)
.020% Arizona
Patent Investors
Theo Heiner
F
01-30-70
4,557.70)
.010% Alphalite
Enterprises, L.P.
Judith Elaine Heiner
B
04-18-70
296.09)
John Clyde Lamb
F
10-31-69
2,207.10)
Joseph A. Lamb
F
11-15-69
2,459.80)
Priscilla Lamb
F
11-15-69
1,984.50)
Willa Dean Lamb
F
11-30-69
1,918.70)
James C. Lamb
F
12-15-69
904.50)
.050% Aqualectra, L.P.
John C. Lamb
F
12-15-69
576.80)
John Lamb
F
10-30-70
123.60)
James Lamb
F
11-30-70
78.08)
John Lamb
F
11-30-70
630.60)
Joseph A. Lamb
B
12-24-70
1,354.50)
Payment never received
Joseph A. Lamb
B
12-24-70
728.00)
Olin D. Hipps
B
05-06-70
943.50
Downpayment and
commission on house
Elna Lilienquist
F
11-15-69
3,831.80)
Newell L. Lilienquist
B
04-25-70
1,472.00)
Newell Lilienquist
F
07-15-70
10,526.00)
.047% Trideca II
Gary B. Larson
B
12-17-70
1,242.00)
Lewis D. Rogers
B
Unknown
Unknown)
Melvin E. Salveson
B
07-15-70
6,150.00)
Dr. Melvin E. Salveson
B
07-15-70
20,500.00)
7,500 shares Systems
General Corp.
Robert White
B
06-13-70
456.50)
Jerry C. Henderson
F
12-30-69
1,988.00)
Helen Henderson
F
12-30-69
1,066.45)
.010% Trideca II, L.P.
Jerry C. Henderson
F
01-30-70
2,056.60)
Joseph DeLong
F
03-15-70
1,336.30)
DeLong Modular
Systems stock
Lilian DeLong
F
03-15-70
1,137.50)
Lyle V. Davis
F
02-28-70
3,802.40
.010% Trideca II, L.P.
Pete J. Coury
F
06-30-70
1,635.90
Real estate and house
downpayment
Don Johnson
F
10-30-70
5,176.50
.30% Aqualectra, L.P.
Ruth M. Allen
F
12-15-69
370.12)
.020% Sonel Precious
Metals Partners
Carl B. Allen
F
12-30-69
1,859.20)
*220 APPENDIX C 1971
POLICY HOLDER
INSURANCE
DATE OF
and/or INSURED
COMPANY
POLICY
COMMISSION
PROPERTY RECEIVED
Scott Lucas
F
03-31-71
$937.00)
Donald Lee Lucas
B
02-10-71
1,242.00)
Marvin Lee Harris
B
Unknown
Unknown)
Ann Harris
B
02-10-71
1,056.00)
14,000 shares Sierra Trading
Corporation
Donald Lee Lucas
B
02-10-71
1,863.00)
Sally Steadman Lucas
B
02-10-71
1,083.00)
Eleanor C. Steadman
B
02-10-71
2,676.00)
Harold Levin
F
01-15-71
3,712.00)
Radio Time
Harold A. Levin
B
02-06-71
2,238.00)
Lowell Paxson
F
01-15-71
1,860.00
Radio Time
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided. Includes a mathematical error of $1,346 in original.
*↩ The unexplained discrepancy of $3.00 appears in the deficiency notices.
2. Ariz. Rev. Stat. Ann. section 25-211↩ (1976).
3. United States v. Porth,426 F.2d 519 (10th Cir. 1970), cert. denied 400 U.S. 824 (1970); Edwards v. Commissioner,680 F.2d 1268 (9th Cir. 1982); United States v. Daly,481 F.2d 28 (8th Cir. 1973), cert. denied 414 U.S. 1064↩ (1973).
4. Petitioner came to the same conclusion later in 1970 and commenced suit against Ellsworth. The suit was settled before the end of 1970.↩
5. Section 1244 provided in pertinent part: (a) General Rule. -- In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset. * * * (c) Section 1244 Stock Defined. -- (1) In General. -- For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if -- (A) such corporated adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan, (B) at the time such plan was adopted, such corporation was a small business corporation, (C) at the time such plan was adopted, no portion of a prior offering was outstanding, (D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), and (E) such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock is sustained (or if such corporation has not been in existence for 5 taxable years ending before such date, during the period of its taxable years ending before such date, or if such corporation has not been in existence for one taxable year ending before such date, during the period such corporation has been in existence before such date), derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this subparagraph only to the extent of gains therefrom); except that this subparagraph shall not apply with respect to any corporation if, for the period referred to, the amount of the deductions allowed by this chapter (other than by sections 172, 243, 244, and 245) exceed the amount of gross income. Such term does not include stock if issued (pursuant to the plan referred to in subparagraph(A)) after a subsequent offering of stock has been made by the corporation.
(2) Small Business Corporation Defined. -- For purposes of this section, a corporation shall be treated as a small business corporation if at the time of the adoption of the plan -- (A) the sum of -- (i) the aggregate amount which may be offered under the plan, plus (ii) the aggregate amount of money and other property (taken into account in an amount, as of the time received by the corporation, equal to the adjusted basis to the corporation of such property for determining gain, reduced by any liabilities to which the property was subject or which were assumed by the corporation at such time) received by the corporation after June 30, 1958, for stock, as a contribution to capital, and as paid-in surplus, does not exceed $500,000; and (B) the sum of -- (i) the aggregate amount which may be offered under the plan, plus (ii) the equity capital of the corporation (determined on the date of the adoption of the plan), does not exceed $1,000,000. For purposes of subparagraph (B), the equity capital of a corporation is the sum of its money and other property (in an amount equal to the adjusted basis of such property for determining gain), less the amount of its indebtedness (other than indebtedness to shareholders.↩
6. Section 165 provides in pertinent part: (a) General Rule. -- There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. -- In the case of an individual, the deduction under subsection (a) shall be limited to -- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and * * * (f) Capital Losses. -- Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. (g) Worthless Securities. -- (1) General Rule. -- If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.↩
7. THE COURT: Do you have any further witnesses that you wish to call? THE WITNESS: Just myself, just my testimony as far as the fraud case goes. THE COURT: What else have you got to offer? THE WITNESS: That I have never tried to hide anything. I have been open and above board on it. And they [IRS] know it. I have been in contact with them since '69. And they called on me in '72, and presented me with a letter, and told me that I was under investigation. And I have never hid from them. I mean, they have always been aware of where I was. When they indicted me in '74, I found it out by reading the Arizona Republic one morning, that I had been indicted. And because of that, I went over to the U.S. Marshal's Office here in Phoenix and asked them if they had a warrant for my arrest. And they informed me that they didn't. And I says, "Well," * * * "I read in the paper that I had been indicted." * * * "If you have a warrant for my arrest, [or] if you get a warrant for my arrest," * * * "here's my phone number. Call me." * * * "I'll come over." And I have not hid any money in any checking account in anybody else's name or tried to keep any business dealings secret. It has always been open and above board. I have been fighting them on principle, Your Honor. I [didn't] lie and cheat on that 1040 form. But I have been fighting them on principle, * * * they're depriving me of my rights that my Founding Fathers * * * pledged their life, * * * their good name and their fortune. Many of them gave it, you know, to get rid of -- no disrespect to you, Your Honor, but -- a prerogative court such as I am sitting in today. * * * THE COURT: Mr. Cooley, you are launching into argument, and this is not the place for it. It should be in your brief. THE WITNESS: Just to show intent, Your Honor. Sorry. I maintain that I have been honest and above board. And I have never committed any fraud, criminal fraud. THE COURT: Or civil fraud[?] THE WITNESS: Or civil fraud. And in addition to that, what is the other? If the Judge don't find in your favor for fraud, what's the other you got against me? THE COURT: Negligence and intentional disregard for the Rules and Regulations. * * * I assume you and I could agree that you intentionally disregarded all the rules and regulations that said -- THE WITNESS: No, I didn't. THE COURT: -- you should have filed a complete income tax return -- THE WITNESS: It's the intent, Your Honor.↩